**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0928-23

WCPP RISK PURCHASING
GROUP, INC,

    Plaintiff-Respondent,

v.

LEXINGTON INSURANCE
COMPANY,

    Defendant-Appellant.

_____

Submitted December 17, 2024 – Decided June 13, 2025

Before Judges Susswein and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-1025-22.

Riker Danzig LLP, attorneys for appellant (Michael J. Rossignol and Eric J. Snowden, on the briefs).

Sherman, Silverstein, Kohl, Rose and Podolsky, PA, attorneys for respondent (Alan C. Milstein, Jeffrey P. Resnick, and Lanique A. Roberts, of counsel and on the brief).

PER CURIAM

This appeal involves an insurance coverage dispute arising from a wrongful death lawsuit brought by the estate of a person alleged to have died because of mold. In an underlying action, plaintiff WCPP Risk Purchasing Group, Inc. and other parties were sued for wrongful death. Plaintiff sought coverage from its insurance provider, defendant Lexington Insurance Company (Lexington), who denied coverage under its general liability insurance policy due to a mold exclusion endorsement. Plaintiff then sued Lexington alleging breach of contract and requesting declaratory judgment that the policy obligates Lexington to defend and indemnify plaintiff's members as insureds under the policy. Lexington's answer denied liability and asserted several defenses, including that plaintiff's claim lacks standing and is not ripe because plaintiff failed to introduce any evidence that the self-insured limits of the policy have been exhausted.

Both parties moved for summary judgment based on their competing interpretations of the insurance policy. The trial court granted summary judgment for plaintiff and against defendant. The court found that plaintiff had standing to bring the suit on behalf of its members, plaintiff's members were "insureds" under the policy, and the language of the mold exclusion in the policy was ambiguous and thus did not preclude coverage. Defendant appeals, arguing

2

the court erred as a matter of law in applying the plain language doctrine to the terms of the policy, erroneously found that plaintiff had standing, and failed to consider whether the policy's self-insured limit was exhausted.

After considering the record in light of the parties' arguments and governing legal principles, we agree with the trial court that plaintiff has standing to bring this declaratory action. However, we part company with the trial court's determination that the mold exclusion endorsement is ambiguous and thus does not preclude coverage. We therefore reverse and remand for entry of summary judgment in favor of Lexington.

I.

We discern the following pertinent facts and procedural history from the record. Plaintiff is a risk purchasing group (RPG) that purchases insurance coverage on behalf of groups of members who engage in similar business or activities. In this case, plaintiff acquired insurance for a group engaged in commercial real estate, and the group's members includes the Bleznak Organization (Bleznak) who purchased the insurance for the Village of Stoney Run (Stoney Run), an apartment complex.

Concerning the underlying action, the decedent, Darlene Pratt, leased a Stoney Run apartment unit from 1997 to 2019, when she died due to pulmonary

3

injuries. On February 25, 2021, the administrators of Pratt's estate filed a wrongful death complaint against Stoney Run. The amended complaint alleged that Stoney Run negligently failed to maintain the premises, specifically claiming that long-standing water infiltration throughout Pratt's unit allowed mold to permeate the space which damaged the property and caused Pratt's death.

In response, Bleznak sent a claim for coverage to Lexington under its commercial general liability policy, which listed plaintiff as the first named insured on the policy's declarations page. The policy also contained numerous endorsements and schedules. Endorsement #005 was the "BROAD FORM NAMED INSURED ENDORSEMENT[,]" which modified the term "named insured" as it appeared on the policy's declarations page to include additional related entities as within the purview of those insured. Endorsement #030 was the "SCHEDULE OF NAMED INSUREDS[,]" which modified the policy to include additionally named insureds. It reads, "[t]his policy provides coverage for the first Named Insured shown in the Declarations and the following additional Named Insureds: Per Schedule on file with Lexington Insurance Company[.]" The "Schedule of file" listed "BLEZNAK ORG" as the "Master

Client Name (Owner Name)[,]" and "Village of Stoney Run I" and "Village of Stoney Run II" as location names.

A Certificate of Liability Insurance form for the Lexington policy was also issued, listing "The Bleznak Organization" under "INSURED[.]" Under "DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES[,]" the Certificate added: "RE: . . . Named Insured—Village of Stoney Run Apartments[.]"

Aside from the modifications to the policy's named insureds, the policy also contained endorsements that excluded various events from coverage. Endorsement #029 (the mold exclusion) contained a "fungus/mold exclusion[,]" which generally excluded policy coverage for "bodily injury or property damage or any other loss, cost or expense, . . . arising from or associated with clean-up, remediation, containment, removal or abatement, caused directed or indirectly in whole or in part," by fungus or mold.

In addition, the policy's declaration page defined the limits of insurance as $1,000,000 per occurrence with a general aggregate limit of $2,000,000. However, the policy also contained a "SELF-INSURED RETENTION ENDORSEMENT" that indicated a $250,000 "RETAINED LIMIT" for each

A-0928-23

"OCCURRANCE" and limited plaintiff's claims to amounts in excess up to the per occurrence coverage limit of $1,000,000.

AIG Claims, Inc., Lexington's claims administrator, rejected plaintiff's request for coverage through a letter dated November 17, 2021, citing the mold exclusion. In a footnote, Lexington admitted the policy covers Stoney Run.

On April 25, 2022, plaintiff, on Stoney Run's behalf, initiated the present action against Lexington seeking coverage under the insurance policy. Plaintiff's complaint alleged two counts: (1) declaratory judgment/breach of contract and (2) equitable claims. Lexington's answer denied liability and asserted defenses including: (1) lack of standing; (2) insufficient basis for coverage based on the underlying action; and (3) no duty to defend or indemnify.

Lexington moved for summary judgment. Plaintiff opposed it and filed a cross-motion for summary judgment. The trial court heard argument on the competing motions on November 3, 2023. By order and ten-page memorandum decision dated November 8, the court denied Lexington's summary judgment motion and granted plaintiff's cross-motion.

The trial court rejected Lexington's lack of standing argument, explaining that Stoney Run was one of plaintiff's members which demonstrates plaintiff's financial stake in the outcome of the underlying wrongful death litigation. The

6

court added that no party "cited authority suggesting that [RPGs] do not have standing to bring cases on behalf of their members."

The trial court also disagreed with plaintiff's contention that Stoney Run was not a "named insured" or an "additional insured" under the policy, reasoning that the policy conferred coverage to Bleznak as an additional insured, and to Stoney Run because Stoney Run undisputably fell within Bleznak's corporate umbrella. The court noted two reasons to support this conclusion: (1) the plain language of the policy and (2) fairness and intent of the parties. The court emphasized that Lexington had been accepting premium payments to insure Stoney Run for years.

Having concluded that plaintiff had standing to enforce coverage on behalf of Stoney Run, the trial court examined the policy's language and found that the mold exclusion did not preclude coverage for losses incurred from the underlying wrongful death litigation. In so holding, the court reasoned that two interpretations of the mold exclusion existed and plaintiff's interpretation of the policy was reasonable. It relied on the general principle that interpretative disputes should be resolved in favor of the insured. The court thus concluded the mold exclusion did not apply and the policy required Lexington to defend and indemnify plaintiff in the underlying wrongful death action.

A-0928-23

This appeal followed. Lexington contends the trial court erred in granting summary judgment on: the issue of standing; whether plaintiff's members are named insureds; whether the policy's mold exclusion precluded coverage; and whether the self-insured retention limit applied.

II.

We begin our analysis by acknowledging the foundational legal principles that govern this appeal.

Our review of a trial court's summary judgment decision is de novo. DeSimone v. Springpoint Senior Living, Inc., 256 N.J. 172, 180 (2024). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). We "accord no 'special deference' to the 'trial court's interpretation of the law and the legal consequences that flow from established facts.'" Cherokee LCP Land, LLC v. City of Linden Plan. Bd., 234 N.J. 403, 414-15 (2018) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

A non-moving party "cannot defeat a motion for summary judgment merely by pointing to any fact in dispute." Brill, 142 N.J. at 529. Thus, "once

the moving party presents sufficient evidence in support of the motion, the opposing party must 'demonstrate by competent evidential material that a genuine issue of fact exists[.]'" Globe Motor Co. v. Igdalev, 225 N.J. 469, 479-80 (2016) (alteration in original) (quoting Robbins v. Jersey City, 23 N.J. 229, 241 (1957)). Brill further instructs that if the evidence in the record is "so one-sided that one party must prevail as a matter of law . . . the trial court should not hesitate to grant summary judgment." Ibid. (citation omitted).

Furthermore, "[a] trial court's interpretation of an insurance policy's terms is a legal determination, not a factual inquiry, and is accordingly reviewed de novo." AC Ocean Walk, LLC v. Am. Guar. & Liab. Ins. Co., 256 N.J. 294, 312 (2024) (citing Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med. & Physical Therapy, 210 N.J. 597, 605 (2012)). Because insurance policies are contracts of adhesion, New Jersey courts "give special scrutiny to insurance contracts because of the stark imbalance between insurance companies and insureds in their respective understanding of the terms and conditions of insurance policies." Zacarias v. Allstate Ins. Co., 168 N.J. 590, 594 (2001).

Ultimately, a reviewing court should seek to support the "objectively reasonable expectations of the parties." Werner Indus., Inc. v. First State Ins.

Co., 112 N.J. 30, 35 (1988). Ideally, the plain and ordinary language of the policy should reflect those expectations, but should a reasonable alternate interpretation exist, the ambiguity must be resolved in favor of the insured. See Passaic Valley Sewerage Com'rs v. St. Paul Fire & Marine Ins. Co., 206 N.J. 596, 608 (2011) ("If the policy terms are clear, we interpret the policy as written and avoid writing a better insurance policy than the one purchased."). "This is so even if a 'close reading' might yield a different outcome or if a 'painstaking' analysis would have alerted the insured that there would be no coverage ." Flomerfelt v. Cardiello, 202 N.J. 432, 441 (2010) (first citing Zacarias, 168 N.J. at 595; and then citing Sparks v. St. Paul Ins. Co., 100 N.J. 325, 338-39 (1985)).

However, courts are cautioned against rewriting an insurance policy to provide better coverage for the insured. See Kimber Petroleum Corp. v. Travelers Indem. Co., 298 N.J. Super. 286, 300 (App. Div. 1997). Furthermore, there is no doubt that "a stranger to an insurance policy has no right to recover the policy proceeds." Crystal Point Condo. Ass'n, Inc. v. Kinsale Ins. Co., 251 N.J. 437, 448 (2022) (quoting Ross v. Lowitz, 222 N.J. 494, 512 (2015)).

III.

With these general principles in mind, we first address defendant's contention that the trial court erred in granting plaintiff summary judgment on

10

the issue of standing because the record contains no evidence that plaintiff was a designated agent of Bleznak or Stoney Run, that Bleznak or Stoney Run authorized plaintiff to initiate an action, or that plaintiff had a financial stake in the underlying litigation.

The trial court reasoned that plaintiff had standing because, as the first named insured, it qualified as an "agent of all named insureds" and thus had actual authority as agent of Stoney Run to file suit. The court also found that plaintiff had a financial stake in the litigation because it was an RPG contracted to provide a defense to its members, including Stoney Run.

Whether a party has standing to sue is a threshold question of law subject to de novo review. Petro v. Platkin, 472 N.J. Super. 536, 558 (App. Div. 2022) (citing Cherokee, 234 N.J. at 414-15). "Standing has been broadly construed in New Jersey as 'our courts have considered the threshold for standing to be fairly low.'" Triffin v. Somerset Valley Bank, 343 N.J. Super. 73, 81 (App. Div. 2001) (quoting Reaves v. Egg Harbor Township, 277 N.J. Super. 360, 366 (App. Div. 1994)); see also In re Six Month Extension of N.J.A.C. 5:91-1 et seq., 372 N.J. Super. 61, 86 (App. Div. 2004). Therefore, when there is enough evidence in the record to ascertain a party's standing, "there is no factual barrier to appellate review." Id. at 80.

"Standing 'refers to the plaintiff's ability or entitlement to maintain an action before the court.'" In re Adoption of Baby T., 160 N.J. 332, 340 (1999) (quoting N.J. Citizen Action v. Riveria Motel Corp., 296 N.J. Super. 402, 409 (App. Div. 1997)).  A party's standing must be resolved "before litigants may invoke the judicial power of the courts." Watkins v. Resorts Int'l Hotel & Casino, 124 N.J. 398, 418 (1991) (quoting Robert F. Williams, The New Jersey State Constitution:  A Reference Guide 95 (1990)).

"A litigant has standing only if the litigant demonstrates 'a sufficient stake and real adverseness with respect to the subject matter of the litigation [and a] substantial likelihood of some harm . . . in the event of an unfavorable decision.'" Cherokee, 234 N.J. at 423 (Timpone, J., dissenting) (alteration in original) (quoting Jen Elec., Inc. v. County of Essex, 197 N.J. 627, 645 (2009)). "A financial interest in the outcome ordinarily is sufficient to confer standing." Strulowitz v. Provident Life & Cas. Ins. Co., 357 N.J. Super. 454, 459 (App. Div. 2003) (citing In re Camden County, 170 N.J. 439, 448 (2002)).

And while third parties may not assert the rights of others, Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 436 (App. Div. 2011), real parties in interest may, R. 4:26-1.  In this context, "New Jersey law does not recognize

A-0928-23

any distinction between the concepts of standing and real party in interest." N.J.

Citizen Action, 296 N.J. Super. at 413.

Rule 4:26-1 instructs:

> Every action may be prosecuted in the name of the real party in interest; but an executor, administrator, guardian of a person or property, trustee of an express trust or a party with whom or in whose name a contract has been made for the benefit of another may sue in the fiduciary's own name without joining the person for whose benefit the suit is brought. A trustee of an express trust may be sued without the beneficiaries of the trust unless it shall affirmatively appear in the action that a conflict of interest exists between the trustee and the beneficiaries.

This rule clarifies that a "real party in interest" includes "a party with whom or in whose name a contract has been made for the benefit of another may sue in the fiduciary's own name without joining the person for whose benefit the suit is brought." Ibid.

In addition, New Jersey has a long history of rejecting procedural bars in favor of justice. "In the overall we have given due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of 'just and expeditious determinations on the ultimate merits.'" Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107-08 (1971);

see also Handelman v. Handelman, 17 N.J. 1, 10-11 (1954). "And that principle is premised on a core concept of New Jersey jurisprudence, that is, that our 'rules of procedure were not designed to create an injustice and added complications but, on the contrary, were devised and promulgated for the purpose of promoting reasonable uniformity in the expeditious and even administration of justice.'" Jen Elec., Inc., 197 N.J. at 645 (2009) (quoting Handelman, 17 N.J. at 10).

Here, plaintiff is an RPG comprised of members, including Bleznak, Stoney Run's corporate parent. In the context of insurance law, a "'[p]urchasing group' means any group which: has as one of its purposes the purchase of liability insurance on a group basis; purchases such insurance only for its group members and only to cover their similar or related liability exposure; is composed of members whose businesses or activities are similar or related with respect to the liability to which members are exposed by virtue of any related, similar or common business, trade, product, services, premises or operations; and is domiciled in this or any other state." N.J.S.A. 17:47A-2; accord N.J.A.C. 11:2-36.2.

Plaintiff chose to pursue the insurance claim through the RPG as the first named insured on behalf of its member, Bleznak. Lexington argues that the record did not establish that plaintiff is a party in interest or that Bleznak

authorized plaintiff to initiate the action on its behalf. We are unpersuaded. No party challenges whether Stoney Run has a stake in the outcome of this matter.[1]

There is little caselaw in New Jersey addressing the relationship between an RPG and its members for purposes of establish standing. However, based on the facts pertaining to the corporate structure and the makeup of this particular RPG, we are satisfied the trial court properly denied Lexington's motion for summary judgment as to standing.

Bleznak is a member of plaintiff and named as an additional insured under the applicable policy issued by defendant. Specifically, Endorsement #005 provides that the first named insured, plaintiff, "is the appointed and irrevocable agent for all Named Insureds . . . ." Bleznak is a "real party in interest" pursuant to Rule 4:26-1, as it is "a party with whom or in whose name a contract has been made for the benefit of another [who] may sue in the fiduciary's own name without joining the person for whose benefit the suit is brought."

Bleznak is an agent on behalf of its affiliate, Stoney Run, as a matter of corporate structure. Under the policy, a "named insured" includes "any subsidiary, associated, affiliated, or allied company or corporation (including

---

[1] We note that while discussing the structure of the complaint during oral argument before the trial court, plaintiff offered to amend its complaint to resolve any technical issue if required, but the offer was not further addressed.

subsidiaries thereof) of which any insured named as the Named Insured on the Declarations Page has more than [fifty percent] ownership interest in or exercises management or financial control over at the inception date of this policy . . . ." Stoney Run is owned by Bleznak, and therefore is also a "named insured."

We reiterate that Lexington confirmed its understanding of plaintiff's corporate ownership in its letter denying coverage on alternate grounds. Further, a Certificate of Liability Insurance indicates that the Village of Stoney Run Apartments is a named insured.[2] At a minimum, Stoney Run is listed as a "location" in Endorsement #030. In sum, plaintiff is a "real party in interest" because Bleznak is a member of the RPG, and Bleznak is an agent on behalf of its affiliate, Stoney Run.

---

[2] Relying upon State v. Lavrik, 472 N.J. Super. 192, 214 n.6 (App Div 2022), Lexington argues that a certificate of insurance cannot alter or amend the policy's terms or its duty to indemnify. However, we are persuaded that the Certificate of Liability Insurance demonstrated the parties' intent, as it "would nonetheless be admissible at trial on the issue of whether the parties intended plaintiffs to be covered under the policies." Newport Assocs. Phase I Dev. s. Ltd. P'ship v. Travelers Cas. & Sur. Co., No. A-5543-11 (App. Div. Jan. 16, 2015) (slip op. at 33).

A-0928-23

Lexington alternatively argues that the court confused an RPG with a Risk Retention Group (RRG),[3] claiming that an RPG has no financial interest in litigation since it only purchases insurance as a collective bargaining unit but does not spread liability exposure amongst its members, as happens with an RRG. This argument is unavailing however, because Lexington does not challenge plaintiff's corporate umbrella structure, which alone provides a basis for concluding that plaintiff has a financial interest in the wrongful death litigation.

## IV.

We next address Lexington's related contention that the trial court failed to recognize that Stoney Run is not listed as a named insured or an additional insured through declaration or endorsement. Lexington maintains the policy does not "run with the land" and therefore covers only property owned by an insured party.

In finding coverage, the trial court explained that Lexington does not dispute that any of the subject entities are part of the Bleznak corporate

---

[3] "A [r]isk retention group means any corporation or other limited liability association: which is organized for the primary purpose of, and whose primary activity consists of, assuming and spreading all, or any portion, of the liability exposure of its group members . . . ." N.J.S.A. 17:47A-2; accord N.J.A.C. 11:2-36.2.

umbrella. Moreover, the court found it would be unfair to allow Lexington to disclaim coverage after accepting premium payment for the property. The court ultimately concluded that the evidence, including the Stoney Run deed transfers for nominal consideration between plaintiff's entities, supported finding coverage for the insured.

We concur. In <u>Motil v. Wausau Underwriters Ins. Co.</u>, we recently clarified that there are two classes of covered insured: those expressly named and those who are entitled to coverage. 478 N.J. Super. 328, 338 (App. Div. 2024). As to the latter class of covered insured, we explained:

> "[T]hose listed as 'named insureds' are not necessarily the only individuals covered under the policy," and "[o]ther individuals not listed as 'named insureds' may be entitled to liability coverage under certain circumstances enumerated by the policy." . . . "Thus, being an 'insured' under a policy 'is a combination of status and circumstance,'" . . . .
>
> [<u>Ibid.</u> (quoting <u>Cassilli v. Soussou</u>, 408 N.J. Super. 147, 155 (App. Div. 2009)) (alterations in original).]

Here, Bleznak is named as an additional insured under the policy. Besides plaintiff's own assertions and certifications, the record indicates that Bleznak owns a myriad of related entities, namely, Stoney Run LLC, Stoney RA, Village of Stoney Run, Stoney Run Sec III and Bleznak Associates, all of which are therefore covered by the Lexington General Liability Policy pursuant to

Endorsement #005. As we noted earlier, that endorsement creates coverage for "any subsidiary, associated, affiliated, or allied company or corporation (including subsidiaries thereof) of which any insured named as the Named Insured on the Declarations Page has more than [fifty percent] ownership interest in or exercises management or financial control over at the inception date of this policy . . . ." This circumstance alone supports the conclusion that losses occurring by any entity owned by any named insured warrants coverage.

The evidence also establishes that the parties intended to cover Stoney Run. While Lexington correctly states that the Certificate of Liability Insurance cannot create insurance coverage or amend a policy, it can evidence the parties' intent for coverage. See Newport Assocs, slip op. at 33. The Certificate of Liability Insurance issued on May 25, 2018 states: "RE: . . . Named Insured— Village of Stoney Run Apartments.".

Further support for the closely held relationship between the Bleznak entities is found in the transfer of title of the Stoney Run property. When the deed to the property changed title in both 1998 and 2013, Stoney Run's sole member, Alan D. Bleznak, executed the documents. In addition, both deeds were transferred for nominal amounts, supporting the inference that these transfers were not arms-length transactions. As we have noted, moreover,

Lexington confirmed this understanding of corporate ownership in its letter denying coverage.

V.

We next turn out attention to the mold exclusion endorsement. Lexington argues that the trial court erred by denying its motion for summary judgment and granting plaintiff's cross-motion for summary judgment. The gravamen of Lexington's argument is any loss attributed to bodily injury or property damage caused directly or indirectly by mold is excluded from coverage. The trial court reasoned that "the interpretation of the mold exclusion by plaintiff is equally reasonable to that interpretation of the defendant. Under these circumstances, it is the interpretation most favorable to the insured which controls. Accordingly, the court concludes that coverage exists for the exposure to mold as a result of water leakage." On this point, we believe the trial court erred in interpreting the policy's plain language. We conclude the mold exclusion applies to the present situation. Accordingly, summary judgment must be reversed and entered in favor of Lexington.

In reaching this conclusion, we reiterate that appellate courts review the trial court's grant of a motion for summary judgment de novo, applying the same standard used by the trial court. See Samolyk v. Berthe, 251 N.J. 73, 78 (2022).

20

Relatedly, "[a] trial court's interpretation of an insurance policy's terms is a legal determination, not a factual inquiry, and is accordingly reviewed de novo." AC Ocean Walk, LLC, 256 N.J. at 312 (citing Selective Ins., 210 N.J. at 605). We thus owe no deference to the trial court's interpretation of the policy's plain language.

As with all contracts, the plain language of an insurance contract will govern the court's interpretation of its terms unless those terms are ambiguous. Motil, 478 N.J. Super. at 338. Where the insured can present a reasonable and alternate interpretation of the policy demonstrating coverage, coverage should be construed in favor of the insured. Ibid.; see also Cypress Point Condo. Ass'n v. Adria Towers, LLC, 226 N.J 403, 416 (2016) (quoting Butler v. Bonner & Barnewell, Inc., 56 N.J. 567, 575 (1970) ("As to insurance contracts specifically, 'the general rule of construction [is] that if the controlling language of a policy will support two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied.'")).

However, not any "far-fetched interpretation of a policy will be sufficient to create an ambiguity requiring coverage." Cobra Products, Inc. v. Fed. Ins. Co., 317 N.J. Super. 392, 401 (App. Div. 1998). Furthermore, "[i]nsureds are [not] relieved of their ordinary duty to review, and to be bound by the terms of,

21

the policy itself." Motil, 478 N.J. Super. at 338 (quoting Pizzullo v. N.J. Mfrs. Ins. Co., 196 N.J. 251, 273 (2008)).

Importantly, "[a] contract 'should not be interpreted to render one of its terms meaningless.'" C.L. v. Div. of Med. Assistance & Health Servs., 473 N.J. Super. 591, 599 (App. Div. 2022) (quoting Porreca v. City of Millville, 419 N.J. Super. 212, 233 (App. Div. 2011)). Rather, all words and phrases contained in the insurance policy and its endorsements must be given effect and not read as meaningless. Flomerfelt, 202 N.J. at 441.

We add that "[e]xclusionary clauses will be 'presumed valid if they are "specific, plain, clear, prominent and not contrary to public policy."'" Norman Int'l, Inc. v. Admiral Ins. Co., 251 N.J. 538, 552 (2022) (quoting Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 528 (2012)). That said, it also is well established in New Jersey that exclusionary clauses "are typically construed narrowly with the onus 'on the insurer to bring the case within the exclusion.'" Mem'l Props., LLC, 210 N.J. at 528; see also Flomerfelt, 202 N.J. at 456. In sum, we are "to interpret coverage provisions broadly and to construe exclusions and limitations narrowly . . . ." Simonetti v. Selective Ins. Co., 372 N.J. Super. 421, 430 (App. Div. 2004).

The exclusionary clause at issue here is set forth in the policy's Endorsement #029, which excludes coverage for:

> Bodily injury or property damage or any other loss, cost or expense, including, but not limited to losses, costs or expenses related to, arising from or associated with clean-up, remediation, containment, removal or abatement, caused directly or indirectly, in whole or in part, by:
>
> 1. Any fungus(i), molds(s), mildew or yeast; or
>
> 2. Any spore(s) or toxins created or produced by or emanating from such fungus(i), mold(s), mildew or yeast; or
>
> 3. Any substance, vapor, gas, or other emission or organic or inorganic body substance produced by or arising out of any fungus(i), mold(s), mildew or yeast; or
>
> 4. Any material, product, building component, building or structure, or any concentration of moisture, water or other liquid within such material, product, building component, building or structure, that contains, harbors, nurtures or acts as a medium for any fungus(i), mold(s), mildew, yeast or spore(s) or toxins emanating therefrom;
>
> regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that bodily injury or property damage, loss, cost or expense.

23

A-0928-23

The first part of the exclusion addresses the actual excluded loss, which is "[b]odily injury or property damage or any other loss, cost or expense." We accept as a matter of common sense that a death constitutes "bodily injury."

The policy language further explains the scope of the exclusion by adding an intervening clause, "including, but not limited to." New Jersey courts "have consistently held that the use of the term 'include' signifies enlargement rather than limitation." State v. Lisa, 391 N.J. Super. 556, 568 (App. Div. 2007); see e.g., State v. Anderson, 6 N.E.3d 23, 30 (Ohio 2014) (quoting State v. Muncie, 746 N.E.2d 1092, 1092 (Ohio 2001) ("The statutory phrase 'including, but not limited to,' means that the examples expressly given are 'a nonexhaustive list of examples.'")).

The policy's intervening clause thus broadens the excluded loss to also mean damage costs or expenses "related to, arising from or associated with clean-up, remediation, containment, removal or abatement." The exclusion is then limited by causation, which are losses "caused directly or indirectly, in whole or in part, by: 1. Any fungus(i), molds(s), mildew or yeast."

Lastly, the exclusion applies "regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that bodily injury or property damage, loss, cost or expense."

A-0928-23

This anti-sequential and anti-concurrent clause defeats the notion that another cause of injury other than fungus/mold may have also contributed to the insured's loss thereby including the loss within the scope of coverage.

We are unpersuaded by the trial court's interpretation of this exclusionary language as ambiguous and susceptible to two reasonable interpretations. On the contrary, the comprehensive language of the exclusion is clear.

We note it is undisputed that the "loss" claimed in the underlying wrongful death litigation is the death of decedent caused by the toxic mold that infested in her apartment at Stoney Run. The complaint alleged that the mold in decedent's unit at Stoney Run was caused by "continued leaking and water infiltration problems" that allowed the water to penetrate the walls and floor of the apartment, which "promot[ed] the growth and development of toxic molds."

There is no allegation that the decedent's death occurred due to a mold remediation effort. Quite the opposite, the wrongful death complaint alleges her death was due to the negligent lack of maintenance. This circumstance renders the enlarging "including, but not limited to" intervening clause inapplicable here.

With respect to causation, the exclusionary clause encompasses, "[b]odily injury or property damage or any other loss, cost or expense . . . caused directly

25

A-0928-23

or indirectly, in whole or in part, by . . . mold . . . regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that bodily injury or property damage, loss, cost or expense."  Thus, as we have already noted, a death caused directly or indirectly by mold, regardless of any other contributing or concurrent cause, is excluded from coverage.

The trial court gave credence to plaintiff's argument regarding the mold remediation example in the intervening clause.  Guided by a Law Division case, Ariston Airline & Catering Supply Co. v. Forbes, 211 N.J. Super. 472 (Law Div. 1986), the trial court concluded that the remediation examples found in the intervening clause could be interpreted to mean that the mold exclusion is only triggered when the bodily injury or loss was "related to" remediation efforts.  However, the language at issue in Ariston is not comparable to the language in the policy before us.

In Ariston, the court was faced with interpreting the causation term, which was "earth movement."  Id. at 482.  The Ariston court determined that the surrounding language shed light on the meaning of "earth movement," which were the natural disaster events listed in the intervening clause.  Ibid.  The Ariston court held that because the definition of "earth movement" was

A-0928-23

susceptible to multiple meanings, the exclusion had to be read narrowly in favor of the insured. Ibid. That case is distinguishable from the present situation, however, because here, no party challenges the boundaries of the correlating "causation" word, which is "fungus" or "mold."

We find more helpful guidance in Simonetti, 372 N.J. Super. 421. In Simonetti, we recognized that "[m]old can be both a loss and a cause of loss." Id. at 429. We explained,

> This distinction between mold damage and loss caused by mold is supported by the very language of Selective's policy: "[w]e do not insure, however, for loss caused by. . . mold . . . ." (emphasis added). This language does not exclude all mold. Rather, it excludes loss "caused by" or resulting from mold. The language clearly focuses on "cause" of the loss, conveying the intention to exclude mold as a cause of loss. But mold which is the loss is not mentioned. If Selective had intended to exclude not only losses caused by mold, but also mold itself, it could have easily expressed that intention.
>
> [Ibid.]

Here, the language of the Lexington policy does exactly as the Simonetti court suggests. The language explicitly excludes losses caused by mold, and additionally excludes loss for the mold itself in the intervening clause (such as losses attributed to the cost of mold removal and remediation).

27

We also find support for our interpretation of the mold exclusion clause in <u>Wear v. Selective Ins. Co.</u>, where we addressed the interpretation of the language contained in an anti-sequential and anti-concurrent clause:

> As noted, the policy at issue contains within the exclusion language an anti-concurrent and anti-sequential clause and excludes coverage from any loss or damage "regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage." We do not consider the exclusion language to be ambiguous. A fair reading of the exclusion is that, despite other potential causes, mold must be excluded as a causative factor in order for there to be a covered loss.

> [455 N.J. Super. 440, 454-55 (App. Div. 2018).]

Here, the policy's anti-concurrent and anti-sequential clause is also clear and unambiguous as it contains nearly identical language: "regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that 'bodily injury' or 'property damage', loss, cost or expense."

In sum, because the underlying wrongful death litigation claimed that the mold caused decedent's bodily injury/death, a fair reading of the plain language of the Lexington policy leads to the conclusion that a loss caused by mold is not covered in any sequence or concurrence of events. Accordingly, we conclude the trial court erred in granting summary judgment for plaintiff in holding that

28

the mold exclusion is susceptible to more than one interpretation and that the claim is therefore covered. We conclude instead that summary judgment must be entered in favor of Lexington on the question of whether it is obligated under the policy to defend and indemnify plaintiff's members as insureds with regard to the underlying wrongful death action.

## VI.

Lastly, because we conclude the policy's mold exclusion applies, we need not reach Lexington's alternative contention that the trial court ignored the self-insured retention provision of the policy, which required coverage only after the insured had paid $250,000.

To the extent we have not specifically addressed them, any remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). We reverse and remand for entry of summary judgment in favor of Lexington. We do not retain jurisdiction.

Affirmed in part and reversed and remanded in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0928-23